# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.   3:21-cv-024 |
| Plaintiff, | : | |
| v. | : | |
| FORTY-ONE THOUSAND AND 00/100 DOLLARS ($41,000.00) IN UNITED STATES CURRENCY, | : | **VERIFIED COMPLAINT FOR FORFEITURE IN REM** |
| Defendant 1, | : | |
| and | : | |
| EIGHTEEN THOUSAND AND 00/100 DOLLARS ($18,000.00) IN UNITED STATES CURRENCY, | : | |
| Defendant 2. | : | |

Plaintiff, United States of America, by its undersigned counsel, alleges the following for its action against the defendants in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure.

## NATURE OF THE ACTION

1. This is a civil action *in rem* brought to enforce 21 U.S.C. § 881(a)(6), which provides for the forfeiture to the United States of:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

## THE DEFENDANTS IN REM

2. Defendant 1 is Forty-One Thousand and 00/100 Dollars ($41,000.00) in United

States Currency. On or about July 23, 2020, the Drug Enforcement Administration ("DEA") seized Defendant 1 from Deon Jones's carry-on bag and backpack, following a consensual encounter with him at the Dayton International Airport. The United States has deposited Defendant 1 into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

3. Defendant 2 is Eighteen Thousand and 00/100 Dollars ($18,000.00) in United States Currency. On or about July 23, 2020, the DEA seized Defendant 2 from Deziree Reyes's checked bag, following a consensual encounter with her at the Dayton International Airport. The United States has deposited Defendant 2 into the Seized Asset Deposit Fund, where it will remain during the pendency of this action.

## JURISDICTION AND VENUE

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendants under 21 U.S.C. § 881(a)(6). This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. This Court has *in rem* jurisdiction over the defendants under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio.

6. Venue is proper in this district under 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture occurred in the Southern District of Ohio and under 28 U.S.C. § 1395 because the defendants were found in the Southern District of Ohio.

## BASIS FOR FORFEITURE

7. The defendants are subject to forfeiture under 21 U.S.C. § 881(a)(6) because they

represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## **FACTS**

8. On or about July 23, 2020, the DEA Dayton Resident Office and the Dayton Police Department received information about the suspicious flight itineraries of passengers identified as Deon Jones ("Jones") and Deziree Reyes ("Reyes"), who were scheduled to travel from the Dayton International Airport ("DAY") to the San Francisco International Airport on United flight #3732 on July 23, 2020, at 6:15 p.m. from Gate B19.

9. Jones's itinerary showed that he was traveling back to San Francisco, a known source area for illegal drugs, from Dayton, a known destination area for illegal drugs, after arriving just the previous day from San Francisco. Reyes's itinerary showed that she had booked her trip back to San Francisco on a one-way flight from Dayton.

10. Investigators learned that Jones has previous arrests, among others, for felony drug possession to include cocaine, marijuana, and hashish, and weapons violations.

11. On July 23, 2020, at approximately 3:42 p.m., investigators began to arrive at the DAY to conduct surveillance to locate Jones and Reyes.

12. At approximately 5:23 p.m., Dayton Police Department Detectives Dan Reynolds ("Detective Reynolds") and Sean Copley ("Detective Copley") approached Jones at Gate B19 and conducted a consensual encounter with him.

13. Detective Reynolds introduced himself to Jones, showed Jones his police badge and identification, and then concealed his badge and identification in his pocket. After Jones

agreed to speak with detectives, Detective Reynolds asked Jones to collect his carry-on bags and to follow him to a more private location that was away from the other passengers awaiting flights. They walked approximately fifty feet from where Jones was sitting, and Detective Reynolds obtained Jones's personal identifiers, such as his name, date of birth, and address. While speaking with Jones, the detectives noticed that he had the odor of burnt marijuana on his person and that his eyes were bloodshot.

14. Jones stated that he was flying home to San Francisco, California. When Detective Reynolds asked Jones if he was carrying any cash, he acknowledged that he had $30,000.00 but denied that he had anything illegal in his luggage. Upon request, Jones consented to the search of his carry-on bag by Detective Copley to allow him to see the money. Jones then retrieved the key to the lock on his carry-on bag and handed it to Detective Copley. Jones also was carrying a backpack that matched his carry-on bag.

15. Prior to searching Jones's carry-on bag, DEA Task Force Officer Christopher Coverstone ("TFO Coverstone") requested Detective Jeremy Stewart ("Detective Stewart") of the Dayton Police Department and his canine partner "Weston" to conduct a free-air sniff of Jones's carry-on bag. Jones's carry-on bag was placed away from Jones and along a wall for the sniff.

16. Prior to the arrival of the canine team, Jones explained to Detective Reynolds that he was carrying cash because he flew to Dayton to purchase a dump truck, but he had changed his mind and did not purchase the truck. When asked what kind of truck Jones intended to purchase, he said, "A 2010." According to Jones, he could not remember the make, model, and color of the truck.

17. Jones said that a friend was selling the truck but that he did not know his friend's name. Jones asked Detective Reynolds why he needed the name of his friend. Detective

Reynolds responded that he would call the friend to verify the vehicle information and that Jones was there to look at the truck. Jones declined to give his friend's phone number or name. As detectives spoke to Jones, they continued to smell the odor of marijuana on his person.

18. Jones assured Detective Reynolds that his money was legitimate and stated that he owns a business by the name of Dynamite Janitorial Service, which had the same address as his residence. Jones stated that his family owns a trucking company by the name of AIP Trucking and that his parents, siblings, and other family members are involved in this trucking business. Jones declined to provide a phone number for his parents and acknowledged that they are deceased. Jones then looked in his cell phone and provided a telephone number for a Kanisha Parish, who he identified as his sister. Jones claimed that his parents left the business for his sister to run.

19. Upon Detective Stewart's arrival, he used Weston to conduct a sniff of Jones's carry-on bag. Weston made a passive, positive alert to the odor of illegal narcotics on Jones's carry-on bag. The canine team of Detective Stewart and canine Weston is certified by the Ohio Peace Officer Training Commission and the Office of the Ohio Attorney General in narcotics detection and is trained to detect odors for marijuana, cocaine, heroin, methamphetamines, and their derivatives.

20. Detectives asked Jones to walk a short distance away to an empty gate while they conducted the consent search of his carry-on bag. Detective Copley searched Jones's carry-on bag and, as he did so, Jones told Detective Copley where to find the money. When Detective Reynolds asked Jones how the money was packaged, he said it was in bundles of $1,000.00 each.

21. Detective Copley located thirty-three bundles of United States currency. Eighteen bundles were inside one vacuumed-sealed, plastic bag and concealed inside a folded blanket. Fifteen bundles were in another vacuumed-sealed, plastic bag and concealed inside folded

clothing. Each bundle was held together with a rubber band.

22. As Detective Copley unpacked the money from the plastic bags, Detective Reynolds asked Jones if he had any money in his backpack, and Jones said that he had $2,000.00. Jones consented to the search of his backpack and handed it to Detective Reynolds. Detective Reynolds placed the backpack on the ground near Detective Copley. Detective Copley searched the backpack and located a large, single stack of $50.00 bills, which appeared to be more than $2,000.00.

23. When asked about the amount of money in his backpack, Jones changed his story and said that it was $8,000.00. Detective Reynolds asked Jones if Reyes's checked luggage contained any money, and he said that her luggage contained $17,000.00.

24. Jones stated to Detective Reynolds that he flew into Dayton with Reyes on July 22 and that they arrived around 7:40 p.m. Jones said that they went to a hotel in Dayton to spend the night, but he could not recall the name of the hotel.

25. When Detective Reynolds asked Jones why he would carry cash to make such a large purchase when as a business owner, he could have made a wire transfer or written a check. Jones said that he does not deal with banks.

26. Detective Reynolds asked Jones if he had smoked marijuana recently, and he admitted that he had smoked marijuana at the Dayton Mall with his friend about forty-five minutes prior.

27. Jones acknowledged that he bundled the money into $1,000.00 stacks and said that he withdrew the money, all in cash, from a bank. According to Jones, the money was remaining from a refinance. Detective Reynolds asked Jones if the bank had given all the money to him in small bills like the money he possessed, and he said, "No." Jones then claimed that he could not

remember the name of his bank or the date that he withdrew the money from the bank.

28. Jones told Detective Reynolds that he met his friend in the Dayton Mall area and that they went to another location after meeting to look at the truck. Jones said that he decided against buying the truck once he inspected it.

29. During the time that the detectives were speaking to Jones, Dayton Police Department Detective John Howard ("Detective Howard") and Sergeant Kelly Hamilton ("Sergeant Hamilton") and TFO Coverstone approached Reyes and conducted a consensual encounter with her. Reyes provided a California driver's license to identify herself, which was handed back to her as she spoke mainly to Detective Howard during this time.

30. Detective Howard identified himself to Reyes and asked if he and Sergeant Hamilton could speak with her. Reyes agreed to speak to investigators, and she was asked to walk a short distance away from the other travelers where their conversation continued. During their conversation, Detective Howard learned that Reyes had flown to Dayton on the previous day and that she was returning to San Francisco.

31. According to Reyes, she is in a relationship with Jones, they have known each other for a few years, and they met in San Francisco. Reyes indicated that she does not know anyone in Dayton, but Jones has some friends in Dayton who he was hanging out with.

32. Reyes also stated the following: she stayed with Jones at the Marriot Hotel on Miller Lane; she had a small carry-on bag when she arrived in Dayton, but it was placed in her checked luggage; Jones packed her checked luggage, and she did not know whether he had placed anything in her bag; and she did not know that she was responsible for any items in checked luggage under her name.

33. When asked whether she had any large amounts of money in her checked bag,

Reyes stated, "Not that I know of." Detective Howard then asked Reyes whether she had any large amounts of drugs in her bag, and she again stated, "Not that I know of."

34. Reyes agreed to show Detective Howard her ticket, which he observed had a sticker attached to the back of it and identified her checked bag with tag number 3019509421. Reyes declined Detective Howard's request to search her bag. After Reyes denied the request to search her checked bag, she was advised that her bag was going to be pulled from the plane, that a narcotics canine was going to conduct a sniff of the luggage, and if the canine alerted and indicated to the bag, a search warrant would be applied for to search the bag. Reyes stated that she understood.

35. Reyes stated that she has worked at FedEx in San Francisco for the past eleven years and that FedEx Ground does not offer any special flying benefits. Reyes indicated that Jones did not help her pay for her ticket.

36. While speaking with Reyes, TFO Coverstone heard that her voice was soft and that Reyes appeared overly nervous as her responses to questions were slightly delayed, and she appeared to be surprised by the questions.

37. Through a ticketing agent with United, TFO Coverstone requested that the airline retrieve Reyes checked bag with tag number 3019509421. At approximately 5:35 p.m., TFO Coverstone retrieved Reyes's checked bag, a silver, hard shell Samsonite suitcase, from the United counter.

38. At approximately 5:39 p.m., Detective Stewart and canine Weston conducted a free-air sniff of Reyes's checked bag, which resulted in a positive alert and indication to the bag for the odor of illegal narcotics. At this time, TFO Coverstone and DEA Special Agent Austin Roseberry advised Reyes that they were seizing her bag and provided her with a receipt.

Investigators also advised Reyes on how to obtain her items and bag back, which would be held in the Dayton Police Department property room.  Reyes provided investigators with telephone numbers.

39. At approximately 5:48 p.m., TFO Coverstone arrived in the area of Jones's consensual encounter and observed that the United States currency was being photographed.  TFO Coverstone then collected the seized currency and placed it in two evidence bags in the presence of Jones.  Jones signed the bags, and they were sealed in his presence.  TFO Coverstone could smell the odor of marijuana coming from the currency as he placed it in the plastic evidence bags.

40. At approximately 6:00 p.m., both Jones and Reyes boarded their flight to San Francisco.  TFO Coverstone and DEA Special Agent Lucas ("SA Lucas") took possession of Reyes's luggage, which they transported to the Dayton Police Department.  At this time, Detective Howard drafted a state search warrant for Reyes's checked luggage.

41. At approximately 8:31 p.m., Detectives Howard and Copley advised TFO Coverstone that the warrant was approved and signed by The Honorable Judge Christopher D. Roberts of the Dayton Municipal Court.  A few minutes later, investigators opened the suitcase and located a large, vacuum-sealed bag that contained a white blanket.  Inside the blanket were eighteen bundles of United States currency, which were held together with small, black rubber bands and smelled of marijuana.  Reyes's luggage also contained three pairs of new Nike men's shoes and a multi-colored woman's bag.  TFO Coverstone secured the currency in an evidence bag.

42. Based on training and experience, investigators know that the deliberate concealment of United States currency is indicative of bulk transportation of illegal drug proceeds.

43. Considering all the accumulating factors with respect to Jones and Reyes,

investigators determined that there was probable cause to seize the United States currency from Jones and Reyes as proceeds from drug-related activities.

44. An official count of the United States currency seized from Jones's carry-on bag and backpack revealed that the currency totaled $41,000.00 (Defendant 1).

| Denomination | Quantity | Total |
|---:|---:|---:|
| $50 | 160 | $8,000.00 |
| $20 | 1,497 | $29,940.00 |
| $10 | 194 | $1,940.00 |
| $5 | 173 | $865.00 |
| $1 | 255 | $255.00 |
| | | $41,000.00 |

45. An official count of the United States currency seized from Reyes's checked luggage revealed that the currency totaled $18,000.00 (Defendant 2).

| Denomination | Quantity | Total |
|---:|---:|---:|
| $20 | 894 | $17,880.00 |
| $10 | 6 | $60.00 |
| $1 | 60 | $60.00 |
| | | $18,000.00 |

46. As indicated above, the majority of the currency seized from Jones and Reyes was in $20.00 denominations, which is consistent with drug trafficking.

47. Based on the foregoing facts, the United States asserts that the defendants are subject to forfeiture to the United States under 21 U.S.C. § 881(a)(6) because they represent property furnished or intended to be furnished in exchange for a controlled substance, represent proceeds traceable to such an exchange, or were used or intended to be used to facilitate any violation of 21 U.S.C. § 841 or a conspiracy to commit such offense, in violation of 21 U.S.C. § 846.

## CLAIM FOR RELIEF

WHEREFORE, the plaintiff respectfully requests that:

(a) the Court find there is probable cause to believe that the defendants have been forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6);

(b) pursuant to Rule G(3)(b)(i), Supplemental Rules, the Court issue a warrant of arrest *in rem*, directing the United States to arrest and seize the defendants and to retain the same in its custody subject to further order of the Court;

(c) the Court, pursuant to Rule G(4), Supplemental Rules, direct the United States to give notice to all persons and entities having an interest in the defendants to assert in conformity with the law a statement of any interest they may have, including notice by publication on the official government website, www.forfeiture.gov, for thirty consecutive days;

(d) the forfeiture of the defendants to the United States be confirmed, enforced, and ordered by the Court;

(e) the Court thereafter order the United States to dispose of the defendants as provided by law; and

(f) the Court award the United States all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

s/Deborah D. Grimes
DEBORAH D. GRIMES (0078698)
Assistant United States Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
Deborah.Grimes@usdoj.gov

## **VERIFICATION**

I, Steven M. Lucas, hereby verify and declare under the penalty of perjury that I am a Special Agent with the Drug Enforcement Administration, that I have read the foregoing Verified Complaint for Forfeiture In Rem and know the contents thereof, and that the matters contained in the complaint are true to my own knowledge, except those matters stated to be alleged on information and belief and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, and my investigation of this case.

I hereby verify and declare under the penalty of perjury that the foregoing is true and correct.

1/19/2021
Date

STEVEN M. LUCAS, Special Agent
Drug Enforcement Administration